HENRY B. FREEMAN AND JANE E. SEDWICK, *Adm'rs of* JOSHUA SEDWICK *vs.* JAMES C. SEDWICK.—*December,* 1847.

*C.* and *S.,* brothers, not being indebted to each other, and for a nominal consideration, agreed with each other, that *C.* should convey certain personal property to *S.* *S.* by another agreement, stipulated to re-convey the property to *C.* or to him in trust for his wife and children. *C.* then agreed to confess a judgment to *S.,* who further agreed to sue out execution, levy it upon the

whole estate of *C.*, make purchases to the amount of the judgment, and then convey it to *C.* or to him in trust for his wife and children. This judgment was confessed, and *S.* died. It was then revived by his administrators. It appeared in fact, and by the answers to a bill filed by *C.* to vacate the agreements and judgments, and procure a re-conveyance of the property to himself, that their object, *known to both parties*, was to hinder, delay and defraud the creditors of *C. Held*, that the complainant was not entitled to relief in equity.

It is the policy of the law to withhold all aid and relief from parties in controversies between themselves, who stand strictly *in pari delicto*, and which might or could tend to the consummation of an agreement entered into in fraud of the law, or the rights of any person, unless in cases where public policy would thereby be promoted.

APPEAL from the Court of Chancery.

The bill in this cause was filed on the 16th January, 1845, by the appellee against the appellants. It stated, that in May, 1837, the said *James*, in order to settle certain personal estate upon himself and family, as he might afterwards determine, executed a deed thereof to his brother, *Joshua*, for the nominal consideration of $7,000; whereas, no such sum, nor any other money, nor valuable consideration, was paid by any person nor received by the said *James* therefor; that further to execute the purpose aforesaid, *James* and *Joshua* executed another agreement, under seal, dated 23d September, 1837, whereby, in consideration of $10,000, alleged to be paid to *Joshua*, he bound himself to convey to the said *James*, or to him in trust for his child or children, the personal property so as aforesaid conveyed to the said *Joshua*; that on the said 23d September, the complainant entered into a further agreement with the said *Joshua*, that the said *James* should confess a judgment on an alleged note of hand, of 1st August, 1837, on which judgment the said *Joshua* was to have execution levied on the whole of the said *James'* real and personal property, and buy the same, and convey the whole thereof to the said *James*, or to him in trust for his wife and children, by which agreement it was also provided to enter the same satisfied; that in pursuance of such agreement, the judgment was confessed for $10,000, with interest; that on the 7th Decem-

ber, 1842, *Joshua* died; the appellants were appointed his administrators; that the complainant never was indebted to the said *Joshua* in any of the sums mentioned in the said deed and judgment, was neither indebted to *Joshua* or his administrators at any time, that *Joshua* was indebted to him, and his administrators paid him; that he, the appellant, has always remained in the possession of the personal property, claiming the same as his own; that he has required said administrators to reconvey to him, and cancel said agreements, which they refused, and that said administrators are about to take possession of his property, and proceed on said judgment, to enforce the same by sale. Prayer for a re-conveyance of the property and its increase; that the judgment may be entered satisfied, and the whole business annulled and set aside: and for subpœna, injunction and general relief.

The answers admitted the conveyance to the deceased, *Joshua*, without any personal knowledge in the defendants of the consideration for the same—nor of the motives which led to the same, &c. But they have heard and believe, that at and before the time of executing said conveyance, the said complainant became largely indebted unto divers persons, and executed the said conveyance with the intent and design of defeating and defrauding his said creditors in the recovery of their just claims, and of securing said property to himself and family. The agreement to re-convey was admitted, which was alleged to be further to effectuate the said fraudulent intent. The judgment and execution were also admitted, as a part of the machinery to be resorted to, to consummate such fraud; that the judgment was revived by *scire facias* after *Joshua's* death. The answer also admitted the intent to take possession of the negroes conveyed to their intestate, and to issue execution, that, as the child of *Joshua* is an infant of tender years, they cannot safely enter up satisfaction of the judgment; and they submit themselves to such decree as the Chancellor may award.

Exhibit No. 1, filed with the bill, was a conveyance by *James C. Sedwick*, in consideration of $7,000, paid to him by *Joshua*, for a variety of negroes and other personal property,

absolutely, dated 2d May, 1837, duly acknowledged and recorded.

Exhibit No. 2.—An agreement of 23d September, 1837, between *Joshua* and *James*—that *Joshua*, in consideration of $10,000, to him in hand paid, hath agreed to convey to *James* the property mentioned in Exhibit No. 1, on demand, to him, or to him in trust for his children and child, or children yet to come: and for the faithful performance thereof, the parties, respectively, bound themselves, each to the other, in the sum of $20,000.

Exhibit No. 3 was another agreement of the 23d September, 1837, between the same parties, by which *Joshua* agreed to take the earliest opportunity in making a judgment on a note of hand of *James*', dated 1st Aug. 1837. And the said *Joshua* did also agree to issue on the said judgment against the said *James*, and execute the whole of the said *James*' property, real and personal, and buy the whole of it, in or so far as the amount of the judgment would go, and then convey the whole amount to the said *J. C. S.*, or to him in trust for his wife and children; and " *J. C. S.* being desirous to provide for his wife in case of his death, the said *Joshua* doth further agree, in case of the said *J. C. S*'s death, that his widow, *Sarah C. Sedwick*, shall be entitled to the whole of the real estate of the said *J. C. S.*, and her choice of one negro during her widowhood; provided the execution shall be carried into effect, and in case of her marriage or death, the property left to the said *Sarah C. S.* to be equally divided among the children of the said *J. C. S.* It is further understood, that if the said *J. C. S.* finds it unnecessary to carry the execution into effect, the said *Joshua* will enter the judgment satisfied, and the whole business shall be annulled and void, and of no effect."

Exhibits 4 and 5 were the judgments revived by *fieri facias* of *Joshua vs. James C. Sedwick*, for $10,000, confessed originally at October, 1837.

After the answers came in, a general replication was filed, and a commission issued, which showed by its proof the said *Joshua* largely indebted in 1837, and the motive and object of

the agreements to be as stated in the answers and opinion of this court.

At March term, 1846, the Chancellor decreed a re-conveyance of the property and satisfaction of the judgments to be entered, and that the defendant pay costs.

The Chancellor was of opinion that the deeds, agreements and judgments could not be impeached upon the ground of their being entered into in fraud of creditors, because no one, as a creditor, so far as appears by the proceeding in this cause, has drawn them in question on that or any other ground.

The defendants appealed to this court.

The cause was argued before ARCHER, C. J., DORSEY, CHAMBERS, SPENCE, MAGRUDER and MARTIN, J.

By STOCKETT and ALEXANDER for the appellants, and

By D. WIRT and RANDALL for the appellees.

MAGRUDER, J., delivered the following dissenting opinion.

The intestate of the appellants, by an obligation dated 23d September, 1837, stipulated to convey to the appellee divers negroes and other personal property; and to obtain such a conveyance, this bill was filed in the Court of Chancery. The appellants, who are the administrators of the intestate, rest the claim to relief upon the single ground, that a deed to the intestate conveying the same property on the 2d May, 1837, had been executed by the appellee, and, of course, accepted by the appellants' intestate, for the purpose of defrauding his (the appellee's) creditors. The defence then is, that a fraud was intended to be practised upon others, and that the appellants' intestate and the appellees were the persons who intended to practise it: that the property which the intestate covenanted to convey was fraudulently acquired by him, and therefore his contract to convey it, although no other objection can be urged to the execution of it, ought not, for that one reason, to be enforced in equity. To such a defence the maxim would seem to apply: " *Nemo suam turpitudinem allegans est audiendus.*"

" No man," said *Lord Mansfield,* 1 *Black. Rep.* 364, " shall set up his own iniquity as a defence, any more than as a cause of action."

If the appellee in this case had filed his bill to set aside the deed because there was no valuable consideration for it, the same having been executed by him to defraud his creditors, no doubt the defendants might have demurred. But there is no attempt here to meddle with the deed of the appellee to the appellants' intestate. The bill assumes that deed to be valid to vest the title to the property in the party grantee, and founds the complainant's title to relief upon the solemn contract by the party grantee, to convey the property to the complainant when thereto requested. To the fulfilment of his own contract, his representatives object simply because the title which he has undertaken to convey was fraudulently acquired by him. But such defence, admitting it to be true, in point of fact, is utterly inadmissible. " A deed," said *Justice Holroyd,* (2 *Barn. Alder,* 376,) " may be avoided on the ground of fraud, but then the objection must come from a person neither party nor privy, for no man can allege his own fraud to avoid his own deed." The fraud of which the intestate was guilty against the creditors of the complainant, set forth in the answer, can furnish no defence to a bill asking a specific execution of the intestate's contract, in regard to which it is not alleged that it is fraudulent either against the creditors of complainant or of the intestate.

Granting that the deed of the appellee might be impeached by his creditors with success, the answer to this, when urged here, is that the creditors of the appellee are not in this suit, and of course in this suit it cannot be made to appear that those creditors are prejudiced by that deed. Until it is impeached by them, no one can deny that it is a valid deed.

A conveyance may be fraudulent against creditors, provided they are the parties impeaching it; but until some of them impeach it, no body else can, upon this ground. The grantee has no more right than the grantor to say that it is void, because executed to defraud creditors; and therefore can make

no such defence when required to execute his own deliberate contract to convey the property of which he thus became the owner, no matter whether that contract is with the grantor in the deed or with a stranger.

If the grantor in the deed, or a stranger, or indeed, a creditor of the grantor, took any of this property out of the possession of the grantee, in an action of replevin brought by the latter to recover the property, the defendant could not dispute the title of which that deed furnished evidence, by any proof which could be offered, that the deed was executed to defraud creditors. They, and they only, can for this impeach the deed, and unless they choose to impeach it, none other (certainly not the grantee,) can impeach it. Proof, therefore, however conclusive, that the deed was executed with intent to defraud the creditors of the grantor, is entirely out of the case, unless the person who would adduce that proof, appears in court as a creditor, proves himself to be a creditor of the grantor, and in a situation to impeach the deed. 1 *Ves. Jr.* 161.

It may be, as is stated, that there are in *Calvert* County Court judgments against the appellee. But none of those creditors are here, and as there are none such in this court impeaching this deed, this court can know nothing of creditors anywhere else. In this case, we have no right to know, or surmise that the appellee ever was indebted to any being. The decision of the case does not depend on the indebtedness of the appellee at the time of executing this deed, or at any other time, and the affirmance of the decree of the Chancellor will not certainly prejudice the rights of any such creditors or at all hinder or delay them in the recovery of their debts.

In most of the attempts which are made to impeach the deeds of persons indebted, it is very much the practice to treat the case as if the grantor in the deed was the only culpable person, and as though the grantee, if not an innocent and meritorious party, must not be regarded as *particeps criminis*. But there would be fewer fraudulent grantors if fraudulent grantees could not be found, and to countenance such a defence as this, instead of suppressing, would perhaps

encourage fraud. As to the correctness of this defence, it would shock the morality of *Newgate*, if the grantee was alive and making it. Surely the intestate of the appellants, if the representation given by the latter is to be credited, ought not to be a favorite in equity, and entitled to the protection of the court. In order to show that the appellee is not entitled to relief, he is placed before the court in the character of a thief, and they are thus forced to represent their intestate to be a receiver of stolen goods, knowing them to be stolen. Now it may be that some general rule or maxim of equity may protect the latter when there is nothing but iniquity in his own conduct. He is entitled to the benefit of the maxim, "*Nemo suam turpitudinem allegans est audiendus*," provided it will protect them from this claim; but the rule is adopted and must be applied to the case as well when it will prejudice, as when it will protect, the grantee in a fraudulent deed. If the complainant had asked that his deed be set aside, because designed to delay and hinder creditors in the recovery of their claims, his own statement given in his bill would have defeated him, and of course, a demurrer to such a bill would have been ruled good; but the matter here insisted upon by the appellants is introduced into the case as matter of defence, and is no part of the plaintiffs' cause of action. We have already seen what *Lord Mansfield* said of such a defence.

The defence is, that the intestate not only agreed to assist the appellee in defrauding his creditors by taking a conveyance of his property; but in order to obtain that, agreed to hold the property conveyed in secret trust for the grantor and his family. Now if any such trust had been declared in the deed, it would have been equally fraudulent and void as against creditors, if they were thereby prejudiced, and chose to impeach it; but if they did not complain, could the grantee have refused to execute the trust upon the ground that others might ask that the deed be declared fraudulent and void as against them? The real ground of defence is, that the deed which gives the property to the grantee is void, and when considered void, can convey no title to him; and because of

this, it is said that he is not bound to execute his own contract, disclosing no such defect in his title to convey the title which he has in the premises.

The appellee does not ask that his own deed may be avoided, or make any objection to the title thereby conveyed; but regards it as a valid deed, and claims, in this suit, nothing but the title thereby given.  He is not alleging his own fraud; and therefore of him it cannot be said, that he alleges *suam turpitudinem.*  If his bill had been taken *pro confesso,* the validity of the deed could not be brought into question.  The maxim spoken of then, furnishes no bar to the relief which is here sought.

The creditors, if there be creditors, of the appellee, will certainly not be hindered or delayed in the recovery of their debts, by making the debtor the unquestioned owner of the property which the appellants insist ought to be made answerable for his debts.  If there are none such, if the appellee himself has satisfied them, neither law nor equity ought to hinder the execution of the contract into which the appellants' intestate entered with the appellee, who, it may be, as has been suggested, has purged the fraud which it is charged he once committed; and, at the same time, it may hinder a perpetration by the other party of a double fraud.

SPENCE, J., delivered the opinion of this court.

. The bill in this case states that on or about the 2d May, 1837, the complainant, in order to settle certain personal estate upon himself and family, as he might afterwards determine, executed a deed thereof to his brother, *Joshua Sedwick,* in whom he reposed implicit confidence, for the nominal consideration of $7,000, whereas no such sum, nor any other money, nor any other valuable consideration whatever, was paid therefor by the said *Joshua* or any other person, or received by the said *James* or any other person for him.  The bill further charges, that in order further to execute the purposes aforesaid, and settle his property on himself and family as he might determine, the complainant and respondent executed another

agreement, under their hands and seals, dated 23d September following, whereby, in consideration of the sum of $10,000, alleged to be paid to the said *Joshua*, the said *Joshua* bound himself, his heirs, executors and administrators, in the penalty of $20,000, to convey to the said *James C. Sedwick*, or to him in trust for his child, or children, the aforesaid personal property, so as aforesaid conveyed to the said *Joshua*, as would appear, by Exhibit No. 2, filed with his bill. That in order further to effect the said object, the said respondent and complainant did also, on the 23d September, in the year aforesaid, enter into a further agreement, whereby, for the nominal consideration of $10,000, alleged therein to be due from the complainant to the said *Joshua*, the said respondent and complainant agreed that the said complainant should confess judgment on an alleged note of hand, dated 1st August, 1837, payable in thirty days after date, in favor of the said *Joshua*, at the earliest opportunity; on which judgment, the said *Joshua* agreed to have execution issued, and levied on the whole of complainant's property, real and personal, and buy the same, and then convey the whole thereof to the complainant, or to him in trust for his wife and children, &c. By which agreement, it was also expressly provided, that if the said *James C. Sedwick* finds it unnecessary to carry the execution into effect, the said *Joshua Sedwick* would enter the judgment satisfied, and the whole business should be annulled and void, and of no effect. For the faithful performance of which agreement, the parties bound themselves in the sum of $20,000, as appears by complainant's Exhibit No. 3, filed with his bill.

The bill further states, that afterwards, and in pursuance of said agreement, the complainant did, at the October term of *Calvert* County Court, in the year 1837, confess judgment for the aforesaid sum of $10,000, with interest from the 1st September, 1837.

The bill further alleges, that *Joshua Sedwick* departed this life on or about the 17th December, 1842 ; that letters testamentary were granted to *Henry B. Freeman* and *Jane E. Sedwick* by the Orphans Court of *Calvert* County, on the personal

estate of the said *Joshua*; that the said administrators have proceeded to have said judgment revived in their own names as administrators.

The bill charges, that the complainant never was indebted to the said *Joshua* in the sums mentioned in said deed or judgments; that at the time of the death of the said *Joshua*, the complainant was not indebted to him at all, nor hath he since become indebted to his administrators, in any sum whatever; that at the death of said *Joshua* he was indebted to the complainant; and that since the death of the said *Joshua*, his administrators, knowing the debt to be just, have paid the same.

The prayer of the bill is, that the administrators may be required, on their corporate oaths, to answer all the matters and charges in the bill, and to re-convey to the complainant the said personal property and the increase thereof, and have the said judgments entered satisfied, and the whole business annulled, and that subpœna and injunction be awarded to them.

The respondents' answer admits the execution of the several exhibits filed with the complainant's bill, numbered 1, 2, 3, 4 and 5, but deny that they have any personal knowledge of the motives, or consideration, which induced the parties to execute the deed of the 2d May, 1837, the complainant's Exhibit No. 1 ; and therefore cannot undertake to admit or deny that the consideration of $7,000 therein expressed, was paid, or that the use and trust thereof is therein truly expressed. But they have heard, and verily believe, that at and before the time of executing said conveyance, the complainant became largely indebted to divers persons, and executed said conveyance with the intent and design of defrauding and defeating his said creditors in the recovery of their just claims, and of securing his property to himself and his family.

The answers also admit the execution by the said *Joshua* of complainant's Exhibit No. 2, but charge that it was executed in furtherance of the same object, viz : of defrauding and defeating the creditors of said complainant, and of securing, more effectually, the property to the complainant and his children; the consideration therein expressed being merely

nominal, and no part thereof having at any time been paid by the complainant, or any other person, to the said *Joshua.*

The respondents also admit the execution of Exhibit No. 3, and charge that it was executed for the purpose of consummating the same fraudulent purposes, as would appear most evident by an inspection of the paper itself.

The respondents admit the recovery of the judgment against the complainant, as shown by complainant's Exhibit No. 4.

The allegations and averments thus set forth in the bill and answer, together with the proof given by complainant, present the cause upon which the Chancellor passed his decree, and which is now brought up for our review.

Does the complainant's bill, exhibits, and evidence, present such a case as should induce a court of equity to grant the relief asked by the prayer of the bill? If the allegations in the bill and the exhibits filed with it could leave a doubt on an impartial mind, of the fraudulent intentions of the parties to the agreement of the 2d May, 1837, surely the proof offered by the complainant himself must remove such a doubt; for it clearly shows the object and intention of the parties; it quadrates with the statements in the bill, and stipulations in the several exhibits filed with the bill.

The proof offered by the complainant in this cause is full and conclusive, that the agreement of the 2d May, 1837, between *Joshua Sedwick* and *James C. Sedwick,* was entered into to hinder, delay and defraud the creditors of *James,* and that *Joshua* and *James* were in *pari delicto.*

After a careful examination of the authorities, we are brought to the conclusion that courts of equity have held, and uniformly decided, that it was both the wisdom and policy of the law to withhold all aid or relief from parties in controversies between themselves, who stood strictly in *pari delicto,* which might or could tend to the consummation of agreements entered into in fraud of the law, or the rights of any person. *Mr. Justice Story,* in his *Commentary on Equity Jurisprudence,* vol. 1, p. 317, sec. 298, says: " The suppression of illegal contracts is far more likely, in general, to be accomplished by leaving

the parties without remedy against each other, and by thus introducing a preventive check, naturally connected with a want of confidence, and a sole reliance upon personal honor. And so, accordingly, the modern doctrine is established. Relief is not granted, where both parties are truly in *pari delicto,* unless in cases where public policy would thereby be promoted."

In the case of *Roberts vs. Roberts,* 4 *Eng. Exchq.* 448, the bill was filed by *George Roberts* for the purpose of setting aside a voluntary demise of certain hereditaments for a term of years, executed by the testator in his life-time to the defendant as a qualification to kill game.

At the hearing, the *Lord Chief Baron Richards* said : " I do not think the plaintiffs are entitled to a re-conveyance : the deed was executed maturely, the grantor knew the effect of it. There was no fraud at the time between the brothers; with respect to them the whole transaction was perfectly fair. But it appears by the evidence that the object of the deed was to give the defendant the appearance of a qualification, and that it was executed for no other purpose; that was a fraud on the law; and I cannot perceive what right that gives the plaintiffs to come into a court of equity to call for a re-conveyance." Vide *Doe dem. Roberts vs. Roberts' widow,* 2 *Barn.* and *Ald.* 367, where the same case was tried at law.

In *Balt vs. Rogers,* 3 *Paige's Ch. Rep.* 156, *Chancellor Walworth* says : "But I do not see how it is possible to give him (the plaintiff,) any relief in this case without overturning an established principle of law. Wherever two or more persons are engaged in a fradulent transaction to injure another, neither law or equity will interfere to relieve either of those persons as against each other from the consequences of their own misconduct."

In *Starke's Exec'rs vs. Little,* 4 *Randolph's Rep.* 372, *Judge Green* says : " It is a general rule that in *pari delicto potior est conditio defendentis.* But this rule operates only in cases where the refusal of the courts to aid either party frustrates the object of the transaction, and takes away the temptation

to engage in contracts, *contra bonos mores*, or violating the policy of the laws. There is no case in equity (says the Judge,) where relief has been given to the fraudulent grantor in such a case, except in that of *Austin vs. Winston,* 1 *Hen. & Munf.* 33, decided by a divided court."

In *James vs. Bird's Admr.* 8 *Leigh's Rep.* 510, where *Judge Parker* says, " There is no case in equity where any relief has been given to a fraudulent grantor of property, the conveyance being made to protect it against his creditors, except that of *Austin's Admrs. vs. Winston's Exrs.* 1 *Hen. & Munf.* 33, decided by a divided court." Vide also *Wright vs. Wright,* 2 *Little,* 12.

In our opinion, the case of *Stewart vs. Iglehart,* 7 *G. & J.* 132, is conclusive in this.

**DECREE REVERSED AND BILL DISMISSED.**